UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALEXANDRIA JONES,<br><br>    Plaintiff,<br><br>  v.<br><br>JANICE QUINTANA, and<br><br>DISTRICT OF COLUMBIA,<br><br>    Defendants. | Civil Action No. 08-00620 (CKK) |

**MEMORANDUM OPINION AND ORDER**
(July 3, 2012)

  Plaintiff Alexandria Jones, an employee of the District of Columbia's Office of Unified Communications (the "OUC"), brings this action against the District of Columbia (the "District") and Janice Quintana ("Quintana"), the former Director of the OUC.[1] Plaintiff alleges that she was retaliated against for voicing concerns about the manner in which the OUC intended to handle emergency "911" calls and non-emergency "311" calls and for filing a disability discrimination complaint with the District's Office of Human Rights (the "OHR").

  Currently before the Court is Defendants' [75] Motion for Summary Judgment. Defendants contend that Plaintiff's remaining claims are barred by the terms of a settlement agreement (the "Settlement Agreement") entered into in late April 2009, while this action was pending, arising out of a grievance proceeding brought by the National Association of Government Employees, Local R3-07 (the "Union") on Plaintiff's behalf. Upon careful

---

[1] Quintana is now sued solely in her individual capacity.

consideration of the parties' submissions, the relevant authorities, and the record as a whole, Defendants' Motion for Summary Judgment shall be DENIED WITHOUT PREJUDICE.

## I. BACKGROUND

The Court assumes familiarity with its prior opinions in this action, which set forth in detail the history of the case, and confines its discussion here to the background most germane to the instant motion.

### A. *Plaintiff's Factual Allegations*

In briefing the instant motion, the parties dedicate scant attention to the events underlying Plaintiff's claims, focusing instead on the factual circumstances relating to the grievance process and the Settlement Agreement. *See infra* Part I.B. For background purposes, the Court begins by summarizing Plaintiff's version of the underlying events, relying on the allegations in the Third Amended Complaint without making any assumptions as to their veracity.

\* \* \*

Plaintiff began her employment with the District in August 1998. Third. Am. Compl., ECF No. [57], ¶ 2. Six months later, she was promoted to a dispatcher position in the OUC, where her duties involved handling emergency 911 calls and transmitting information to the necessary response teams. *Id.* ¶ 3.

At some point prior to December 14, 2007, Plaintiff learned that Quintana, then the Director of the OUC, was proposing to change the manner in which emergency 911 calls and non-emergency 311 calls would be routed to dispatchers. *Id.* ¶ 5. When Plaintiff first started as a dispatcher with the OUC, non-emergency 311 calls were handled by untrained and uncertified operators, allowing trained and certified dispatchers like Plaintiff to focus their attention on emergency 911 calls. *Id.* ¶ 4. Quintana's proposed changes would adopt a new practice of

routing non-emergency 311 calls to the emergency 911 line, something that Plaintiff believed would have the effect of delaying emergency response times. *Id.* ¶¶ 5-6. According to Plaintiff, the OUC did not employ a sufficient number of trained and certified dispatchers to cover the universe of combined phone calls. *Id.* ¶ 6.

Beginning in late 2007 and continuing into early 2008, Plaintiff attempted to raise her concerns about the proposed changes with members of the District of Columbia Council (the "Council"), then-Mayor Adrian Fenty (the "Mayor"), and the public at large. For example:

- **December 14 and 17, 2007:** Plaintiff wrote to Council members, contending that Quintana's proposed changes would "jeopardize the safety of residents in the District of Columbia." *Id.* ¶¶ 7-8.

- **December 28, 2007 and January 1, 2008:** Plaintiff wrote the Mayor, raising the same concerns and requesting a meeting. *Id.* ¶¶ 9-10.

- **January 11, 2008:** Plaintiff participated in an interview with a local television station, again voicing her concerns about Quintana's proposed changes. *Id.* ¶ 14.

- **January 24, 2008:** Plaintiff testified before the Council, addressing what she believed was the "lowered safety level" that would result from Quintana's proposed changes. *Id.*

An especially significant disclosure occurred on January 7, 2008, when Plaintiff attempted to have an in-person conversation with the Mayor while he was visiting the OUC. *Id.* ¶ 11. The encounter did not go well. Although Plaintiff maintains that she was neither rude nor disrespectful, she claims that the Mayor raised his voice at her and "screamed" that she should "do whatever Ms. Quintana wanted her to do." *Id.*

On January 10, 2008, three days after Plaintiff's encounter with the Mayor, Quintana placed Plaintiff on administrative leave without pay. *Id.* ¶ 12. By that point in time, Quintana was aware of Plaintiff's efforts to "speak out" about the proposed changes to the routing of emergency and non-emergency calls in the OUC, but Quintana justified the decision to place Plaintiff on administrative leave by stating that the Mayor was "not pleased" with Plaintiff and by characterizing Plaintiff as a "disgruntled and disrespectful employee." *Id.*

On January 18, 2008, Quintana proposed that Plaintiff be suspended for a period of thirty days. *Id.* ¶ 18. While it is never made clear, it appears that the contemporaneous justification for the proposed suspension coincided with Quintana's stated reasons for placing Plaintiff on administrative leave one week earlier—namely, that the Mayor was "not pleased" with Plaintiff and that Plaintiff was a "disgruntled and disrespectful employee." *Id.* ¶ 12. However, on February 11, 2008, for reasons that are left unstated, Plaintiff's proposed thirty-day suspension was overruled and the "charges" against her were "dismissed without prejudice." *Id.* ¶ 23.

During this same time period, Plaintiff began receiving medical treatment in connection with what she claims was job-related anxiety. *Id.* ¶¶ 13, 16, 24, 31, 35, 38, 41. On January 24, 2008, Plaintiff was "diagnosed with an impairment/disability because of anxiety" and, on this basis, requested an accommodation to work eight-hour shifts instead of her usual ten-hour shifts. *Id.* ¶¶ 21, 38. It appears that Plaintiff then took leave from work for an unspecified period of time in connection with her condition. *Id.* ¶¶ 36, 39. On July 22, 2008, Plaintiff filed a formal disability discrimination complaint with the OHR. *Id.* ¶ 40.

B.     *Plaintiff's Termination, the Grievance Process, and the Settlement Agreement*

On August 14, 2008, the OUC notified Plaintiff that it proposed to terminate her employment for alleged insubordination and absences without official leave. Defs.' Stmt. of

4

Material Facts as to Which There Is No Genuine Dispute ("Defs.' Stmt."), ECF No. [75], ¶ 1; Pl. Jones [sic] Stmt. of Facts Which Dispute Defs.' Affirmative Defense ("Pl.'s Resp. Stmt."), ECF No. [79-1], pt. I, ¶ 1.  On September 24, 2008, after Plaintiff submitted a written response, the OUC notified Plaintiff of its final decision to terminate her employment effective September 26, 2008.  Defs.' Stmt. ¶ 2; Pl.'s Resp. Stmt. pt. I, ¶ 2.  Plaintiff was informed that she had the right to file an appeal with the Office of Employee Appeals or to file a grievance under the Union's Collective Bargaining Agreement (the "CBA").  Defs.' Stmt. ¶ 3; Pl.'s Resp. Stmt. pt. I, ¶ 3.

By letter dated October 1, 2008, Plaintiff elected to file a grievance through her Union. Defs.' Stmt. ¶ 4; Pl.'s Resp. Stmt. pt. I, ¶ 4.  In the grievance letter, which is signed by both Plaintiff and her Union representative, Plaintiff alleged that the OUC (i) failed to provide a reasonable accommodation for her alleged disability, (ii) retaliated against her for requesting a reasonable accommodation, (iii) terminated her employment without sufficient cause, and (iv) adopted a penalty disproportionate to the alleged misconduct.  *See* Defs.' Stmt. Ex. C (Ltr. from Sarah E. Suszczyk to J. Quintana dated Oct. 1, 2008) at 2-3.  Contemporaneously, Plaintiff executed a statement expressly designating the Union's Assistant Regional Counsel "to act as [her] representative with regard to a grievance and possible arbitration related to [her] removal." *Id.* at 4.

The parties to the grievance proceedings moved towards arbitration before the Federal Mediation and Conciliation Service, but ultimately resolved their dispute through the Settlement Agreement.  *See* Defs.' Stmt. Ex. D (Settlement Agreement).  The Settlement Agreement, executed by various parties in late April 2009, is hardly the model of artful drafting.  The first paragraph defines "[t]he Parties" as the Union and the OUC and provides that "[t]he Parties . . . hereby voluntarily agree to resolve and conclude the . . . arbitration case filed . . . ." *Id.* ¶ 1.

Plaintiff, who signed the Settlement Agreement, is identified only as "the Grievant" in this introductory paragraph and is not included within the definition of "[t]he Parties." *Id.* On the signature page, Plaintiff is likewise identified only as the "grievant" and is allocated a signature block separate from the one for the Union. *Id.* at 4.

For purposes of the instant motion, the operative provision of the Settlement Agreement is the release of claims, which provides:

> The Union shall waive, release, forever discharge from liability the [OUC] and the government of the District of Columbia, as well as its officers, agents, employees and representatives for claims, demands, grievances, or causes of action arising out of and in connection with the removal of [Plaintiff] for alleged insubordination and absence without leave on September 26, 2008. The Union will indemnify the [OUC] and the government of the District of Columbia, as well as its officers, agents, and employees and representatives for any claim brought by the Union alleging a violation of the Collective Bargaining Agreement between the Union and the [OUC] in relation to the removal of [Plaintiff] on September 26, 2008.

*Id.* ¶ 2(b). In exchange for this release of claims, the OUC agreed to, among other things, (i) reinstate Plaintiff to her former position, (ii) return Plaintiff to the grade and step she would have been had she never been removed, (iii) restore all leave and benefits Plaintiff would have earned had she never been removed, and (iv) pay Plaintiff a lump sum of $10,000. *Id.* ¶ 3. Following this exchange of promises, the Settlement Agreement sets forth the following "acknowledgment" clause:

> The Union and [the OUC] acknowledge that this Settlement Agreement resolves the above-captioned matter only and does not affect any other claim [Plaintiff] may have pending or in the future against the Agency for any reason other than the fact that it establishes [Plaintiff] will return to work on April 28, 2009. The parties understand that any claims involving [Plaintiff's] return to work shall be null and void.

*Id.* ¶ 4.

*C.     Procedural History*

When Plaintiff first brought this action on April 10, 2008, prior to the termination of her employment and the execution of the Settlement Agreement, she asserted three overarching claims: retaliation in violation of the District of Columbia Whistleblower Protection Act (the "DC-WPA"), D.C. CODE §§ 1-615.51 *et seq.*; retaliation in violation of the District of Columbia's Workers' Compensation Statute (the "DC-WCS"), D.C. CODE §§ 31-1501 *et seq.*; and deprivation of rights under the First Amendment to the United States Constitution in violation of 42 U.S.C. § 1983 ("Section 1983").  *See* Compl., ECF No. [1], ¶¶ 49-67.  On January 2, 2009, Plaintiff filed an Amended Complaint, asserting two additional claims based on events allegedly transpiring after the filing of the Complaint: failure to provide a reasonable accommodation in violation of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101 *et seq.*; and retaliation in violation of the ADA.  *See* Am. Compl., ECF No. [19], ¶¶ 72-77.

Subsequently, Defendants moved to dismiss Plaintiff's Amended Complaint.  On September 30, 2009, the Court granted the motion in part and denied it in part.  *See Jones v. Quintana*, 658 F. Supp. 2d 183 (D.D.C. 2009).  Specifically, Plaintiff's retaliation claim under the DC-WPA was dismissed against Quintana but survived against the District; Plaintiff's retaliation claim under the DC-WCS was dismissed in its entirety; Plaintiff's Section 1983 claim was dismissed against the District and Quintana insofar as Quintana was sued in her official capacity; Plaintiff's failure-to-accommodate claim was dismissed in its entirety; and Plaintiff's retaliation claim under the ADA survived in its entirety.  *See id.* at 204.  As a result, only two of Plaintiff's claims clearly survived Defendants' motion to dismiss: Plaintiff's retaliation claim against the District under the DC-WPA; and Plaintiff's retaliation claim under the ADA.  *See id.*

As for Plaintiff's Section 1983 claim, the Court observed that Plaintiff's Amended Complaint did not clearly indicate which factual allegations she was relying on in bringing suit against Quintana in her individual capacity. *See id.* at 196. Concluding that it would be unfair to require Quintana to advance a defense of qualified immunity without fair notice of the precise factual allegations asserted against her in her individual capacity, the Court directed Plaintiff to amend her Complaint a second time to identify those factual allegations. *See id.* at 196, 204.

Responding to the Court's directive, Plaintiff's counsel, Jerome E. Clair, Esq., filed a Second Amended Complaint. *See* Second Am. Compl., ECF No. [32]. However, this iteration of the Complaint inexplicably included a single count—Plaintiff's Section 1983 claim—and made no reference to Plaintiff's surviving retaliation claims against the District under the DC-WPA and the ADA. *See id.* ¶¶ 1, 15. In an effort to clarify whether Plaintiff intended to abandon these latter two claims, the Court warned Plaintiff that she would be required to file an amended pleading setting forth all of her legal claims in a single document. *See* Min. Order (Oct. 5, 2009). Despite this warning, Plaintiff's counsel failed to file a timely amended pleading in accordance with the Court's instructions.

Nonetheless, because Plaintiff's Section 1983 claim still remained in the Second Amended Complaint, the Court granted Defendants leave to file a second motion to dismiss addressing that claim. *See id.* Defendants did so, confining their arguments to Plaintiff's Section 1983 claim and assuming that Plaintiff had abandoned her remaining claims. Upon reviewing Defendants' second motion to dismiss, the Court again alerted Plaintiff of her failure to include claims in her Second Amended Complaint and cautioned her that, absent an appropriate amended pleading, the Court would assume that she intended to abandon any unidentified claims. *See* Min. Order (Oct. 23, 2009). Plaintiff's counsel responded by filing a status report with the

Court, stating without further explanation that Plaintiff "did not intend to relitigate any issue that was decided by the court" in resolving the first motion to dismiss and did "not intend to file any response to defendants' motion to dismiss plaintiff's second amended complaint." Pl.'s Status Report, ECF No. [35], at 1.

Based on this response, the Court concluded that Plaintiff had abandoned any claims apart from her Section 1983 claim and that she had, further, conceded the merits of the second motion to dismiss by failing to file a timely opposition. *See Jones v. Quintana*, 665 F. Supp. 2d 1, 4-5 (D.D.C. 2009). With no claims left extant, the Court dismissed the action. *See id.* at 5.

Shortly thereafter, Plaintiff's counsel filed a one-page document styled as a "motion for clarification," first asserting that "[i]n less than 90 days after his inauguration President Obama had restructured the American automobile industry" and then proceeding to ask when the Court would refer this case to a magistrate judge for a settlement conference. Pl.'s Mot. for Clarification, ECF No. [38], at 1. The Court responded by referring Plaintiff's counsel to its prior decision dismissing the action. *See* Min. Order (Oct. 30, 2009).

This prompted Plaintiff's counsel to file a notice of appeal. *See* Pl.'s Notice of Appeal, ECF No. [39]. After Plaintiff learned of the appeal and secured new counsel, the United States Court of Appeals for the District of Columbia Circuit held the appeal in abeyance in order to afford Plaintiff an opportunity to seek relief from this Court. Plaintiff, represented by new counsel, then filed a motion for reconsideration with this Court, submitting a sworn declaration outlining her interactions with her former counsel and submitting a proposed Third Amended Complaint speaking to the concerns previously identified by the Court. The Court granted the motion for reconsideration and directed Plaintiff to file her Third Amended Complaint. *See*

Mem. Op., Order, & Indicative Ruling (Mar. 27, 2011), ECF No. [49]; Am. Order (May 8, 2011), ECF No. [52].

Today, the operative iteration of the Complaint is Plaintiff's Third Amended Complaint. Therein, Plaintiff asserts three "live" claims: retaliation under the DC-WPA against the District (Count I); deprivation of rights under the First Amendment in violation of Section 1983 against Quintana in her personal capacity (Count III); and retaliation under the ADA against the District (Count V). *See* Third Am. Compl. ¶¶ 45-58.

Upon the filing of the Third Amended Complaint, Quintana moved to dismiss Plaintiff's Section 1983 claim (Count III), claiming that she is entitled to qualified immunity. On December 11, 2011, the Court denied Quintana's motion, concluding that "the question of whether Quintana is entitled to qualified immunity must await further development of the factual record." *Jones v. Quintana*, 831 F. Supp. 2d 75, 88 (D.D.C. 2011).

On January 27, 2012, the parties appeared before the Court for a scheduling conference. In anticipation of the scheduling conference, Defendants filed a report in which they argued—for the very first time—that Plaintiff's remaining claims in this case are barred by the terms of the Settlement Agreement. *See* Joint Rule 16.3 Stmt., ECF No. [66], at 2. By the time Defendants raised this argument, approximately two years and nine months had passed since the Settlement Agreement had been signed. In that period, the parties had briefed, and the Court had resolved, multiple dispositive and non-dispositive motions and the case had gone up on appeal and returned to this Court for further proceedings. Due to the belated nature of Defendants' argument, the Court declined to stay discovery while Defendants moved for summary judgment based on the Settlement Agreement. Nonetheless, the Court exercised its discretion to permit

Defendants to file a motion for summary judgment prior to the conclusion of discovery. *See* Scheduling & Procedures Order, ECF No. [67], at 5-6.

Defendants first attempted to file the instant motion on February 10, 2012, but the Court struck Defendants' original submissions as non-compliant with its prior instructions. *See* Order (Feb. 14, 2012), ECF No. [73]. Defendants re-filed on February 21, 2012. *See* Defs.' Mem. of P. & A. in Supp. of Mot. for Summ. J. ("Defs.' Mem."), ECF No. [75]. Plaintiff, in turn, first attempted to file her opposition on March 6, 2012, but the Court struck Plaintiff's original opposition as non-compliant with the Local Rules and this Court's Scheduling and Procedures Order. *See* Min. Order (Mar. 7, 2012). Plaintiff re-filed her opposition on March 9, 2012. *See* Pl. Alexandria Jones' Opp'n to Defs.' Mot. for Summ. J., ECF No. [79]. Defendants filed their reply on March 23, 2012. *See* The District of Columbia and Janice Quintana's Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Defs.' Reply"), ECF No. [80]. The motion is now fully briefed and ripe for a decision. In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision. *See* LCvR 7(f).

## II. LEGAL STANDARDS

### A. *Motions for Summary Judgment*

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that it] . . . is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nor may summary judgment be avoided based on just any disagreement as to

the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of her position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. FED. R. CIV. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not

sufficiently probative, summary judgment may be granted," *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

      B.      *Contract Interpretation under District of Columbia Law*

Under District of Columbia law,[2] the party claiming that an enforceable contract exists bears the burden of showing that there has been a "meeting of the minds," or mutual assent, as to all material terms. *Ekedahl v. COREStaff, Inc.*, 183 F.3d 855, 858 (D.C. Cir. 1999) (*per curiam*). Mutual assent "may be found either in the written agreement or, if the agreement is ambiguous, in the parties' actions at the time of contract formation." *Id.* "Where an ambiguity is present, the intent and understanding of the parties is of critical importance," which entails "a probing inquiry into the understanding of each party to the alleged contract regarding its meaning and effect." *Howard Univ. v. Lacy*, 828 A.2d 733, 737 (D.C. 2003). Often, this requires resort to evidence concerning the circumstances surrounding the making of the contract, including preliminary negotiations and discussions, customary practices of which either party knows or has reason to know, and the course of conduct of the parties under the contract. *In re Bailey*, 883 A.2d 106, 118 (D.C. 2005).

### III. DISCUSSION

Settlement agreements are creatures of contract and, as such, are entitled to enforcement under general principles of contract law. *Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 49 (D.D.C. 2009) (citing *Brown v. Brown*, 343 A.2d 59, 61 (D.C. 1975) (*per curiam*)). Through the instant motion, Defendants argue that Plaintiff's remaining claims in this action are barred by

---

[2] So far as the Court can tell, the parties are in agreement that the Settlement Agreement is governed by District of Columbia law. The Court need not, and does not, question this assumption. *See Patton Boggs LLP v. Chevron Corp.*, __ F.3d __, 2012 WL 2362593, at *5 (D.C. Cir. June 22, 2012). In any event, resolution of the instant motion turns on ordinary and non-controversial principles of agency and contract law that are hardly unique to the District of Columbia.

the terms of the Settlement Agreement. Despite the parties' frolic into a litany of collateral and irrelevant matters, the instant motion actually presents two relatively straightforward questions: is Plaintiff a party to the Settlement Agreement (or otherwise bound by its terms)? and, if so, does the release operate to preclude Plaintiff from pursuing this action?

        *A.*        *Is Plaintiff Bound by the Settlement Agreement?*

The answer to the first question—whether Plaintiff is a party to or otherwise bound by the Settlement Agreement—is not free from doubt.

In this regard, the single, most notable feature of the Settlement Agreement—the one Defendants repeatedly attempt to evade—is that Plaintiff is clearly not identified as one of "[t]he Parties," a designation that is reserved for the Union and the OUC alone. Defs.' Stmt. Ex. C (Settlement Agreement) ¶ 1. Instead, Plaintiff is consistently identified in the agreement by name or as "the [g]rievant." *Id.* ¶ 1 & at 4.

True, Plaintiff signed the Settlement Agreement. *See id.* at 4. But while Defendants seem to believe that this shows Plaintiff's agreement to be bound, the fact that Plaintiff signed in a separate signature block identifying her only as "the grievant"—which, to reiterate, does not bring her within the contractual definition of the term "[t]he Parties"—could just as easily be read as undercutting that conclusion. *See Berliner Corcoran & Rowe LLP v. Orian*, 563 F. Supp. 2d 250, 254 (D.D.C. 2008) ("[A] signature block is unquestionably probative of the capacity in which a person is acting when he or she signs an agreement . . . ."). Simply put, the drafters of the Settlement Agreement proved themselves capable of defining the parties to the agreement, but they conspicuously left Plaintiff off the list.

There is an obvious conclusion to be drawn from Plaintiff's omission from the contractual definition of "[t]he Parties" in the Settlement Agreement—namely, that Plaintiff is

14

not a party to the agreement. Defendants attempt to avoid this obvious conclusion, but they never articulate with any meaningful measure of clarity under what theory they seek to do so. In their opening memorandum, Defendants do little more than conflate the Plaintiff and the Union. *See* Defs.' Mem. at 7-9. In their reply, meanwhile, Defendants posit that the Union entered into the Settlement Agreement on Plaintiff's behalf and assert that Plaintiff is therefore bound under basic principles of agency. *See* Defs.' Reply at 2-4. Though Defendants' argument on this point is disjointed and often difficult to follow, there is some support for their position.[3] It is a non-controversial principle of agency law that "[w]hen an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, . . . the principal and the third party are parties to the contract." RESTATEMENT (THIRD) OF AGENCY § 6.01 (2003). "Whether an agency relationship exists is a question of fact for which the person asserting it carries the burden of proof." *Plesha v. Ferguson*, 760 F. Supp. 2d 90, 93 (D.D.C. 2011) (citing *Railan v. Katyal*, 766 A.2d 998, 1010 (D.C. 2001)). In this case, Plaintiff, who had the option to pursue her grievance without Union representation, expressly authorized the Union to act as her representative. *Compare* D.C. CODE § 1-617.06 ("[A]n individual employee may present a grievance at any time to his or her employer without the intervention of a labor organization . . . ."), *with* Defs.' Stmt. Ex. C (Ltr. from Sarah E. Suszczyk to J. Quintana dated Oct. 1, 2008) at 4 (designating the Union's Assistant Regional Counsel "to act as [Plaintiff's] representative with regard to a grievance and possible arbitration related to [her] removal . . . .").

---

[3] Defendants also appear to make the separate argument that Plaintiff is an intended beneficiary of the Settlement Agreement. *See* Defs.' Reply at 4-7. The argument is, quite frankly, perplexing. Even assuming Defendants are correct that Plaintiff is an intended beneficiary, her status as such would only entitle Plaintiff to enforce the agreement against Defendants, not *vice versa*. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS §§ 304, 309 (1981). It is a fundamental and unobjectionable principle that a contract cannot bind a non-party—*i.e.*, someone who has not assented to be bound to its terms. *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).

But the mere fact that the Union may have had the authority to act as Plaintiff's agent during the grievance and arbitration process does not ineluctably lead to the conclusion that the parties intended to, and in fact did, bind Plaintiff to the Settlement Agreement. Ultimately, the drafters' decision to circumscribe the universe of "[t]he Parties" to exclude Plaintiff, coupled with the fact that the Settlement Agreement on its face imposes no direct obligations on Plaintiff,[4] creates a genuine dispute of material fact precluding summary judgment in Defendants' favor. Accordingly, Defendants' [75] Motion for Summary Judgment shall be DENIED on this basis.

  *B.*  *Does the release preclude Plaintiff from pursuing this action?*

The second question—whether the release precludes Plaintiff from pursuing this action—subdivides into several components. The Court need only address two at this stage.

  1.  <u>Does the Release Cover Plaintiff?</u>

The first component presents a question similar to, but analytically distinct from, the question of whether Plaintiff is somehow bound by the Settlement Agreement: as a matter of contract interpretation, does the release impose any obligations on Plaintiff?

In this regard, Defendants seem to be laboring under the misapprehension that, if they can prove that the Union was acting as Plaintiff's agent in negotiating the Settlement Agreement, then that would somehow magically transform all the references to the Union in the agreement to references to Plaintiff. But even assuming, *arguendo*, that the Union was acting as Plaintiff's agent, the Union nonetheless could have been an independent actor in the negotiation process, and the parties very well could have intended some promises to run from the Union, others to run

---

[4] Defendants contend that the Settlement Agreement required Plaintiff to return to work, *see* Defs.' Reply at 5-6, but this is a specious reading of the agreement, which at best made Plaintiff's return to work a condition precedent to certain aspects of the OUC's performance.

from Plaintiff, and still others to run from both the Union and Plaintiff. And yet Defendants offer no support—legal or factual—for their apparent assumption that all of the obligations described in the Settlement Agreement can be imputed to Plaintiff.

To the contrary, the release provides that "*[t]he Union* [agreed to] . . . waive, release, forever discharge from liability the [OUC] and the government of the District of Columbia . . . ." Defs.' Stmt. Ex. C (Settlement Agreement) ¶ 2(b) (emphasis added). To the extent Defendants intend to suggest that this language reflects an intention that the release cover Plaintiff, the agreement is, *at best*, ambiguous.[5] In that case, even if Defendants' interpretation is not facially implausible, the problem is that there is virtually no evidence in the record as to what the parties' understandings actually were at the time of contracting and whether those understandings were reasonable. These gaps in the record are fatal to Defendants' motion because the question of whether there has been a "meeting of the minds" must be approached with an eye towards how a reasonable person in the contracting parties' position would have understood the agreement. *Akassy v. William Penn Apartments Ltd. P'Ship*, 891 A.2d 291, 299 (D.C. 2006). Here, Defendants have utterly failed to supply the sort of evidence—such the circumstances surrounding the making of the contract and customary practices of which either party knows or has reason to know—that would permit the Court to engage in the "probing inquiry into the understanding of each party" that is required in this context. *Howard Univ.*, 828 A.2d at 737.

On this record, the Court can only conclude that Defendants have failed to establish their entitlement to judgment as a matter of law. Accordingly, their [75] Motion for Summary Judgment shall be DENIED on this separate, independent basis.

---

[5] At this point, the Court assumes, without deciding, that the language is ambiguous.

### 2. Does the Release Cover Plaintiff's Claims?

The second component likewise presents a question of contract interpretation: does the scope of the release cover the claims asserted by Plaintiff in this case?

The release extends to any claims "arising out of and in connection with the removal of [Plaintiff] for alleged insubordination and absence without leave on September 26, 2008." Defs.' Stmt. Ex. C (Settlement Agreement) ¶ 2(b). Even assuming that this language is clear enough on its own, it is rendered ambiguous by the agreement's "acknowledgment" clause, which provides:

> The Union and [the OUC] acknowledge that this Settlement Agreement resolves the above-captioned matter only and does not affect any other claim [Plaintiff] may have pending or in the future against the Agency for any reason other than the fact that it establishes [Plaintiff] will return to work on April 28, 2009. The parties understand that any claims involving [Plaintiff's] return to work shall be null and void.

*Id.* ¶ 4. This action was "pending" at the time the Settlement Agreement was drafted. Therefore, the first sentence of the acknowledgment clause would suggest that the only effect of the agreement on this action is to establish that Plaintiff "will return to work." But the following sentence provides that claims involving Plaintiff's return to work "shall be null and void." The uncertain relationship between these two sentences, and their uncertain relationship to the release's reference to claims relating to Plaintiff's "removal," render the agreement ambiguous.

Because the agreement is ambiguous in this regard, the Court must engage in "a probing inquiry into the understanding of each party to the alleged contract regarding its meaning and effect." *Howard Univ.*, 828 A.2d at 737. As before, *see supra* Part III.B.1, Defendants have failed to supply the sort of evidence that would allow the Court to conduct this inquiry. As a result, the Court can only conclude that that Defendants have failed to establish their entitlement to judgment as a matter of law. Accordingly, their [75] Motion for Summary Judgment shall be DENIED on this separate, independent basis.

## IV. CONCLUSION

The remaining arguments tendered by the parties are either without merit or need not be reached in light of the basis for the Court's decision. Therefore, and for the reasons set forth above, it is, this 3rd day of July, 2012, hereby

**ORDERED** that Defendants' [75] Motion for Summary Judgment is DENIED WITHOUT PREJUDICE. Defendants are free to re-raise their arguments concerning the Settlement Agreement in their post-discovery motion for summary judgment, upon further development of the factual record.

**SO ORDERED.**

\_\_\_\_\_/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge