# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ALEXANDRIA JONES,

    Plaintiff,

       v.

JANICE QUINTANA, *et al.*,

    Defendants.

**Civil Action No. 08-0620 (CKK)**

## MEMORANDUM OPINION
(October 1, 2013)

Plaintiff Alexandria Jones, a former employee of the District of Columbia Office of Unified Communications ("OUC"), filed suit against the District of Columbia and Janice Quintana, the Director of the OUC, alleging that (1) the Defendants retaliated against the Plaintiff in violation of the District of Columbia Whistleblower Protection Act, D.C. Code §§ 1-615.51 *et seq.*; (2) Defendant Quintana retaliated against the Plaintiff for exercising her First Amendment rights in violation of the 42 U.S.C. § 1983; and (3) the Defendants retaliated against the Plaintiff in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101 *et seq.* Presently before the Court is the Defendants' [91] Motion for Summary Judgment. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court finds the Defendants are entitled to summary judgment on all remaining claims. Accordingly, the Defendants' motion is GRANTED.

---

[1] Defs.' Mot. for Summ. J., ECF No. [91]; Pl.'s Opp'n, ECF No. [95]; Defs.' Reply, ECF No. [100]; Pl.'s Notice, ECF No. [101].

# I. BACKGROUND

*A.     Factual Background*

From 1999 until 2008, the Plaintiff was employed as a 911 operator with the Office of Unified Communications ("OUC"). Defs.' Stmt. ¶ 1.[2] In 2007, Defendant Janice Quintana was appointed by then-Mayor Adrian Fenty to serve as the Director of the OUC. *Id*. ¶ 2. The OUC "provides centralized, District-wide coordination and management of public safety voice radio technology and other public safety wireless communication systems and resources." *Id.* ¶ 3. Prior to 2007, the District of Columbia utilized "727-1000" as a telephone number for city services. *Id.* ¶ 4. Mayor Anthony Williams, Mr. Fenty's predecessor, proposed replacing the 727-1000 number with "311." *Id.* Immediately after taking office in January 2007, Mayor Fenty outlined a plan to establish 727-1000 as a 24-hour, 7-day per week "Mayor's Call Number," within six months, and intended to roll-out the 311 number within one year. *Id.* ¶ 5.

Defendant Quintana testified before the City Council on March 8, 2007, and explained that OUC was working towards operating the 727-1000 number 24 hours per day, and "eventually merging the 7-digit telephone number to a 3-digit 311." Defs.' Stmt. ¶ 6. Ms. Quintana further testified that in order to determine best practices, OUC officials visited "311" and "911" call centers in Chicago and other major cities. *Id.* ¶ 7; Defs.' Ex. 1 (Quintana Dep.) 27:6-28:9. She further indicated that OUC officials attended a number of meetings conducted by

---

[2]  As indicated in the September 21, 2012, Scheduling & Procedures Order, ECF No. [89], the Court strictly adheres to the requirements of Local Civil Rule 7(h)(1). As the Court previously advised the parties, the Court may assume facts identified by the Defendants in their statement of material facts are admitted unless such facts are controverted in the Plaintiff's responsive statement. *Id.* at ¶ 6(d). Thus, the Court shall cite to the Defendants Statement of Undisputed Material Facts ("Defs.' Stmt.") unless a statement is contradicted with evidence, in which case the Court may cite to the Plaintiff's Response ("Pl.'s Resp. Stmt.") or directly to the record, as appropriate.

community organizations in the District of Columbia to discuss the merger of the 727-1000 and 311 telephone numbers with citizens of the District. Defs.' Stmt. ¶ 8.

Ms. Quintana testified before the City Council once again on March 16, 2007, at which point Councilmember Phil Mendelson inquired as to why it made sense to combine the 727-1000 and 311 numbers. Defs.' Stmt. ¶ 9. Ms. Quintana indicated that the new system would be modeled after systems in several major cities, including Baltimore, Chicago, and New York, would have a dedicated staff for each number, and would allow emergency operators to handle only 911 calls. Id.[3] During the hearing, Mr. Mendelson and Ms. Quintana discussed the different purposes underlying the 727-1000, 311, and 911 numbers, and various models and systems for handling emergency and non-emergency police calls. Id. ¶ 10.

On December 14, 2007, the Committee on Public Safety and the Judiciary conducted a hearing regarding the OUC. The Plaintiff alleges that she and several of her co-workers sought leave to attend the hearing, but their requests were denied. Jones Aff. ¶¶ 19-20. During the hearing, Councilmember Yvette Alexander explained she had received complaints from her constituents regarding confusion as to whether particular situations were considered emergencies or non-emergencies. Defs.' Stmt. ¶ 11. Councilmember Mendelson indicated that he had received similar complaints of confusion. Id. ¶ 13. Ms. Quitana explained that the 727-1000 number would "collapse into 311" and utilized for non-emergencies, while 911 would be used anytime the caller sought a police, fire, or ambulance response. Id. ¶ 12. The Plaintiff concedes that the systems routes all calls seeking a police, fire, or ambulance response to the 911 operators, but the Plaintiff "disputes" Ms. Quintana's testimony insofar as the Plaintiff would

---

[3] The Plaintiff disputes the accuracy of Ms. Quintana's statement that the District's system is modeled after the other cities, but does not dispute that Ms. Quintana testified as indicated. Pl.'s Resp. Stmt. ¶ 9.

characterize some of the calls seeking a police response as "non-emergencies." Pl.'s Resp. Stmt. ¶¶ 12, 13.

Following the December 14 oversight hearing, the Plaintiff sent an email to several City Councilmembers asserting that Ms. Quintana "has no ideal [sic] how to run this agency," and "has no communications skills." Defs.' Ex. 2 (12/14/07 Email Pl. to V. Bonnett, J. Graham, D. Catania). The Plaintiff also took issue with Ms. Quintana's plan to require 911 operators to work 10 hour shifts, and asserted that the employees of OUC felt it was a "big mistake" to combine 311 with 727-1000. *Id.* Specifically, the Plaintiff argued that "a lot of citizens of the District of Columbia call 311 with emergency situations and [the merger with 727-1000] would delay service if the call has to be transferred to 911." *Id.* The Plaintiff further suggested that "it will take a long time to get the citizens used to calling 311 for trash service[,] etc." *Id.* The Plaintiff subsequently forwarded the email to City Council Chairman Vincent Gray and Councilmember Yvette Alexander. Defs.' Ex. 3 (12/17/07 Email Pl. to V. Gray, Y. Alexander). Councilmember Jim Graham forwarded the Plaintiff's email to Councilmember Mendelson. Defs.' Ex. 4 (12/18/07 Email).

The Plaintiff testified during her deposition that she had previously expressed concerns regarding the 311 merger to Ms. Quintana during a labor-management partnership meeting in October 2007. Defs.' Ex. 5 (Jones Dep.) 55:8-56:1. The Plaintiff indicated to Ms. Quintana that the merger was problematic because the OUC was understaffed, and the staff had no way of prioritizing emergency calls within the 911 system. *Id.* After Ms. Quintana dismissed the Plaintiff's concerns, the Plaintiff reportedly told Ms. Quintana that the Plaintiff "would contact the City Council, the Mayor and anyone outside of the District government who would listen to [her]." Jones Aff. ¶ 8.

On December 28, 2007, the Plaintiff emailed Mayor Fenty, asserting that the communications center had become "a cluttered warehouse environment," and alleging that the privacy of District citizens could be jeopardized by housing other agencies near the 911 operators. Defs.' Ex. 6 (12/28/07 Email Pl. to V. Gray, V. Bonett). The Plaintiff blamed the Mayor for these issues, stating "I can't understand [sic] my **Mayor Adrien Fenty** has allowed the 911 center to become an unsecured open facility that can and will jeopardize the citizens [sic] confidentiality with emergency calls for service." *Id.* (emphasis in original). The Plaintiff alleged that once the 727-1000 and 311 numbers merged, operators from the 727-1000 line would be forced to take 311 calls "without the benefit of training," which would "be a huge negative impact for the citizens with a delay in service, based on the facts [sic] that 727-1000 employees will have to transfer these calls back to the 911 operators." *Id.* The Plaintiff requested a meeting with Mayor Fenty to discuss the issues further. *Id.* Four days later the Plaintiff sent an email to Mayor Fenty's scheduling assistant "to get his availability to speak with him." Defs.' Ex. 7 (1/1/08 Email Pl. to "Scheduler").

Mayor Fenty visited the OUC on January 7, 2008. The Plaintiff alleges that when she approached the Mayor, indicating that she had been trying to arrange a meeting with him, Mayor Fenty yelled at the Plaintiff, asking "what for?" Jones Dep. 65:21-66:6. The Plaintiff did not give the Mayor her name, and is not sure whether Mayor Fenty knew who she was at that time. *Id.* at 66:7-14; 68:3-8. The Plaintiff purportedly responded by asking the Mayor why he was yelling, and the Mayor responded with "what for?" *Id.* at 70:21-22. The Plaintiff asked "Sir, why are you yelling at me? That's why I don't want to discuss it on the operation floor," to which the Mayor asked "[w]ell what is it?" *Id.* at 73:5-7, 75:5-8. The Plaintiff explained that "it's about the Director and what's going on at the agency." *Id.* at 75:8-10. The Plaintiff alleges

the Mayor replied in a loud voice that "She's the Director. She can do whatever she wants to do. If you have a problem with the Director, you talk to her about it," then looked at the Plaintiff and said "you keep up the hard work" and walked away. *Id.* at 75:8-17. Ms. Quintana testified during her deposition that approximately 20 minutes after he left, the Mayor contacted Ms. Quintana to discuss the incident and instructed Ms. Quintana to fire the Plaintiff for insubordination. Quintana Dep. 117:17-119:1. In lieu of termination, Ms. Quintana placed the Plaintiff on administrative leave on January 10, 2008, informing the Plaintiff that the Mayor with displeased by the Plaintiff's disrespectful behavior. Defs.' Stmt. ¶ 21.

The day after she was placed on administrative leave, the Plaintiff gave a televised interview with a local news station "to let the public know what was going on at the OUC." Defs. Stmt. ¶ 22. The parties disagree as to whether other employees appeared on television to discuss their concerns regarding the proposed agency changes, and whether it was common practice for OUC employees to be interviewed about changes at the agency. Pl.'s Resp. Stmt. ¶¶ 23, 24. Regardless, Ms. Quintana testified that she had no reaction to the Plaintiff's interview, and did not take criticisms of the 311 merger personally because the Mayor wanted to merge the systems. Quintana Dep. 98:20-99:10; 104: 9-20; *but see* Jones Aff. ¶ 42 (alleging Ms. Quintana reacted "in a negative way" whenever the Plaintiff disagreed with Ms. Quintana). Ms. Quintana testified that as of January 18, she was not aware of the Plaintiff's prior contact with the Mayor and Councilmembers regarding OUC, and did not learn that the Plaintiff had contacted Councilmembers until the Plaintiff testified at an oversight hearing on January 24, 2008. Quintana Dep. 97:7-98:19.

On January 18, 2008, Ms. Quintana served the Plaintiff with a proposed 30-day suspension without pay on the grounds the Plaintiff "displayed unprofessional, rude and

disrespectful conduct" towards the Mayor.  Defs.' Ex. 8 (1/18/08 Advanced Written Notice of Proposed Suspension of 10 Days or More) at 1.  The notice indicated that the Plaintiff had previously been reprimanded for "[d]iscourteous treatment of the public."  *Id.* at 2.  The Plaintiff appealed the proposed suspension, and the suspension was ultimately not sustained and dismissed without prejudice.  Defs.' Stmt. ¶ 34.

The Plaintiff testified before the City Council regarding her concerns with the proposed 311 merger during a hearing on January 24, 2008.  Defs.' Stmt. 28.  The Plaintiff testified that she was "very concerned" that the new system would cause a "serious incident," but if the former 727-1000 operators were trained and certified, the new system "may work."  *Id.* ¶ 29.  The Plaintiff also indicated she believed the proposed suspension was retaliatory, the 911 system was understaffed, and the new call system led to backlogs of 911 calls.  *Id.* ¶ 28.  Several other individuals testified to their opposition to the new system during the hearing, including Tiffany Hopper (an OUC employee), and Michael Patterson, the national vice president of the National Association of Government Employees.  *Id.* ¶ 30.  The Plaintiff admits that these individuals testified regarding

> concerns for public safety (Loftus testimony), proper training for call takers (Patterson and Hopper testimony), background checks for employees (Hopper testimony), OUC giving the appearance of being fully staffed when it was not (Hopper testimony), potential delays in answering emergency calls (Hopper and Loftus testimony), and emergency calls building up in the queue (Hopper testimony).

Defs.' Stmt. ¶ 31; *see also id.* ¶¶ 32-33 (describing other discussions during the hearing).

In early 2008, the operators at the OUC began working 10-hour shifts rather than 8-hour shifts, in part because a majority of the operators preferred the longer shift length.  Defs.' Stmt. ¶ 35.  On April 2, 2008, the Plaintiff submitted to her employer a letter from her treating therapist, Sonja Watts-Means, asking that the Plaintiff be provided an accommodation under the

ADA. Defs.' Ex. 9. The letter did not specify the medical condition or the scope of the accommodation, except to say that the Plaintiff "has a series of symptoms and relevant treatment interventions that are sometimes debilitating and impacts [sic] her general sense of wellness," therefore she "should not be subjected to undue stress or intense working conditions." *Id.* The OUC informed the Plaintiff that in order to provide the Plaintiff with a reasonable accommodation, the Plaintiff would have to submit additional information from her medical professional, including "diagnosis, the associated functional limitations; the duration of the limitations, the accommodation being recommended and/or that [Plaintiff] is requesting." Defs.' Ex. 10 (4/10/08 Ltr. A. Bonner-Evans to Pl.) at 1. OUC indicated that while the Plaintiff's request was in review status, she would remain on her regularly scheduled 10-hour shifts, though the Plaintiff would be permitted to take two hours of leave each shift. *Id.* The Plaintiff was advised that "if the business needs of the operations floor change, your request [for leave] may be denied and you will be expected to work the full 10-hour schedule. Should you not work the assigned schedule you may be charged AWOL and disciplinary action may be considered." *Id.*

One week later, Dr. Arnulfo Bonavente, provided OUC with a letter stating that the Plaintiff "is under my care for a medical problem that necessitates treatment with prescription medication," and asked OUC to "allow her to work only eight hours a day while she is recovering from her medical condition." Defs.' Ex. 11 (4/15/08 Ltr.). The Plaintiff's therapist submitted a separate request for a reasonable accommodation on April 24, 2008, indicating that the Plaintiff had been diagnosed with a general anxiety disorder. Defs.' Ex. 12 (4/24/08 Employee Request for Reasonable Accommodation under the ADA). Dr. Watts-Means described the Plaintiff's symptoms as including poor concentration and focus, anxiousness, fatigue, distractability, and headaches. *Id.* at 1. The request asked that the Plaintiff be relocated

to an office with the fewest distractions and undue demands and that she be permitted to work only eight hours per day. *Id.*

Between April 24 and May 15, the Plaintiff had a number of meetings with an administrative officer for the OUC regarding the Plaintiff's request for an accommodation. *See* Defs.' Ex. 13 (5/15/08 Ltr. A. Bonner-Evans to Pl.) at 1. On May 15, OUC notified the Plaintiff that it had received all of the necessary medical documentation, but for an estimate of the duration of the Plaintiff's functional limitations. *Id.* The OUC explained that as a 911 operator, it is essential for the Plaintiff to answer calls, and the emergency calls the OUC receives "require that [Plaintiff] be able to concentrate, provide quick response service and expeditiously route calls for police, fire and EMS, and other public safety. *Id.* Since OUC did not have 8-hour shifts on the emergency operations side, OUC proposed allowing the Plaintiff ten to fifteen minute breaks (if needed) every sixty to ninety minutes during her 10-hour shift, in addition to two fifteen minute breaks and a thirty minute lunch break. *Id.* at 2. It appears that during the May 12 meeting, the Plaintiff rejected the proposed accommodation involving multiple breaks in lieu of a shortened shift. *Id.* As a result, OUC thus offered two additional proposed accommodations: (1) detailing the Plaintiff to a vacant customer service representative position on the non-emergency side, which included an 8-hour shift; or (2) holding the Plaintiff's position as an operator and allowing the Plaintiff to use accrued leave and leave without pay for up to the maximum amount of time permitted by District of Columbia personnel regulations. *Id.*

The May 15 letter from OUC indicated the Plaintiff could continue to use annual or sick leave while the parties finalized the details of the Plaintiff's accommodation request. Defs.' Ex. 13 at 2. The Plaintiff, through her union representative, objected to OUC requiring the Plaintiff to use her accrued leave to work shortened shifts. Defs.' Ex. 15 (5/23/08 Ltr. M. Patterson to A.

Bonner-Evans). The Plaintiff subsequently rejected the proposals set forth in the OUC's May 15 letter, noting that another 911 operator was permitted to work 8-hour shifts to accommodate medication taken for a seizure disorder, and the customer service representative position was on a lower pay scale and scheduled for a peak shift. Defs.' Ex. 16 (5/26/08 Ltr. Pl. to A. Bonner-Evans). Several days later, Dr. Bonavente submitted a follow-up letter to the OUC stating the Plaintiff's improvement "ha[s] been delayed because of her continued stress," and reiterated his recommendation that the Plaintiff be permitted to work only eight hours per day. Defs.' Ex. 17 (5/29/08 Ltr.).

The OUC advised the Plaintiff on June 5, 2008, that she did not have sufficient leave to cover her request for two hours of leave in connection with her shift on June 6, 2008, and that she would be expected to report to work on June 6 as scheduled. Defs.' Ex. 18 (6/5/08 Denied Leave Request). The Plaintiff failed to report to work on June 6 and was issued a letter of warning by Assistant Watch Commander Bennie Coates, advising the Plaintiff that although her overall performance is generally satisfactory, her failure to appear for a scheduled shift was "unacceptable" and her demeanor was affecting her "overall productivity and performance." Defs.' Ex. 19 (6/13/08 Ltr. of Warning) at 1. Mr. Coates indicated that "it may be necessary to take further disciplinary action up to and including dismissal, unless these problems are corrected." *Id.* at 2.

On June 30, 2008, OUC responded to the Plaintiff's May 26 letter regarding the Office's proposed accommodations, discussing the details of the customer service representative position. Defs.' Ex. 20 (6/30/08 Ltr. A. Bonner-Evans to Pl.) at 1. The OUC further indicated that after reviewing the medical documentation submitted by the Plaintiff, "the OUC cannot make a determination as to whether you have a disability as defined by the ADA," and asked the

Plaintiff to provide additional medical information regarding specified topics. *Id.* at 2. Nevertheless, the OUC decided to provide the Plaintiff with a temporary workplace modification in the form of a temporary detail to the customer service representative position in the non-emergency operations side. The parties held a meeting on July 21, 2008, to further discuss the Plaintiff's accommodation request. Defs.' Stmt. ¶ 49. The Plaintiff refused the transfer to the non-emergency position, leading OUC to transfer the Plaintiff back to her original 10-hour shift, and advised the Plaintiff that if she did not work her full 10-hour shift, she would be terminated. Defs.' Ex. 21 (7/24/08 Ltr. A. Bonner-Evans to Pl.). As of July 24, 2008, the Plaintiff had not submitted the additional medical documentation requested by OUC on June 30. *Id.*

The Plaintiff completed informal EEO counseling on July 22, and received a notice of her right to file a discrimination complaint with the District of Columbia Office of Human Rights. Defs.' Stmt. ¶ 50; Defs.' Ex. 22 (7/22/08 Notice of Right to File). Despite prior warnings from OUC, the Plaintiff continued to work only eight hours of her ten-hour shifts, and was charged with being absent without official leave for two hours each shift. Defs.' Stmt. ¶ 51. The Plaintiff filed a formal charge of discrimination with the Office of Human Rights on August 7, 2008, alleging she had been subjected to a hostile work environment and disparate treatment because of her disability, and was threatened with termination in retaliation for engaging in informal EEO counseling. Defs.' Ex. 24 (Charge of Discrimination) at 2-3.

The OUC later served the Plaintiff with a 15-day advanced notice of proposed termination for insubordination and being absent without official leave. Defs.' Stmt. ¶ 53; Defs.' Ex. 25 (8/14/08 Advance Written Notice of Proposed Removal). The Plaintiff, through her union representative, provided a response to the notice to a hearing officer, alleging the failure to accommodate the Plaintiff was retaliation in light of the Plaintiff's July 2008 meeting with an

EEO counselor. Defs.' Stmt. ¶ 54; Defs.' Ex. 26 (8/22/08 Employee Response to Proposed Action) at 2. The Hearing Officer recommended that the Plaintiff's proposed termination be sustained, and OUC terminated the Plaintiff effective September 26, 2008. Defs.' Ex. 27 (Report of Hearing Officer); Defs.' Ex. 28 (Notice of Final Decision Proposed Removal).

B. *Procedural History*

The Plaintiff filed the present action on April 10, 2008, alleging violations of the D.C. Whistleblower Protection Act, retaliation in violation of the D.C. Workers' compensation statute, and deprivation of the Plaintiff's First Amendment Rights. *See generally* Compl., ECF No. [1]. The Plaintiff filed an amended complaint on January 2, 2009, adding additional factual allegations and two new claims: (1) that the Defendants failed to provide the Plaintiff with a reasonable accommodation in violation of the ADA; and (2) the Defendants wrongfully terminated the Plaintiff in retaliation for filing a complaint regarding the Defendants' purported violation of the ADA. *See generally* Am. Compl., ECF No. [19]. The Court granted in part and denied in part the Defendants' subsequent motion to dismiss, leaving only the Plaintiff's claim under the Whistleblower Protection Act, the First Amendment claim as to Defendant Quintana only, and the Plaintiff's ADA retaliation claim. *Jones v. Quintana*, 658 F. Supp. 2d 183 (D.D.C. 2009).

Consistent with the Court's September 30, 2009, Memorandum Opinion, the Plaintiff moved to amend her First Amendment claim, but omitted the remaining claims from the proposed second amended complaint. Pl.'s Mot. to Am., ECF No. [32]. It appeared from the Plaintiff's motion that she was abandoning her remaining claims, but to avoid any ambiguity, the Court ordered the Plaintiff to re-file a second amended complaint including "all facts and remaining legal claims at issue." 10/5/09 Minute Order. The Plaintiff did not submit a revised

second amended complaint. Thus, the Court assumed the Plaintiff was proceeding only with her First Amendment claim, and later granted as conceded the Defendants' motion to dismiss the First Amendment claim. 10/23/09 Minute Order; 10/26/09 Mem. Op. & Order, ECF Nos. [36, 37].

The Plaintiff filed a notice of appeal of the Court's decision granting the Defendants' motion to dismiss as conceded. Notice of Appeal, ECF No. [39]. The United States Court of Appeals for the District of Columbia Circuit held the appeal in abeyance to allow the Plaintiff to seek reconsideration of the Court's order. 4/20/10 Order, ECF No. [41]. After the parties briefed the Plaintiff's motion to reconsider, the Court indicated that it would grant the motion if the D.C. Circuit remanded the matter. 3/27/11 Mem. Op. & Order, ECF No. [49]. The D.C. Circuit subsequently dismissed the appeal and remanded the case to this Court, at which point the Court instructed the Plaintiff to file a Third Amended Complaint. 5/8/11 Am Order, ECF No. [52]; *see generally* Third Am. Compl., ECF No. [57]. The Third Amended Complaint asserts three separate claims. Count I alleges that Defendant Quintana's decision placing the Plaintiff on administrative leave, proposing a suspension, and the Defendants' termination of the Plaintiff constituted retaliation against the Plaintiff for protected disclosures under the Whistleblower Protection Act, namely, the Plaintiff's December 2007 and January 2008 emails to the Mayor and members of the City Council. *Id.* ¶¶ 45-49.[4] Count III contends that Ms. Quintana placed the Plaintiff on administrative leave, proposed suspending her, and later terminated the Plaintiff in retaliation for the Plaintiff speaking to the City Council and the media

---

[4] Each of the Counts set forth in the Third Amended Complaint also allege the Plaintiff's suspension was retaliatory, but as the undisputed record indicates, the proposed suspension was dismissed on appeal, and there is no evidence the Plaintiff ever served any portion of the suspension. Defs.' Stmt. ¶ 34.

regarding the Plaintiff's concerns with respect to the 311 merger. *Id.* ¶¶ 50-54. Count V alleges that the Defendants terminated the Plaintiff in retaliation for engaging in informal EEO counseling in July 2008 regarding the Defendants' alleged failure to grant the Plaintiff an accommodation, in violation of the ADA. *Id.* ¶¶ 55-58. Following the close of discovery, the Defendants filed the present motion for summary judgment, which is now ripe for consideration by the Court.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are

14

susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id*. The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants–CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

## III. DISCUSSION

*A.*  *Whistleblower Protection Act Claim*

The District of Columbia Whistleblower Protection Act prohibits any "supervisor" from threatening to take or taking a prohibited personnel action or otherwise retaliating against an employee because of the employee's "protected disclosure." D.C. Code § 1–615.53. A "protected disclosure" is defined as:

> any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences:
>
> > (A) Gross mismanagement;
> >
> > (B) Gross misuse or waste of public resources or funds;

(C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;

(D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or

(E) A substantial and specific danger to the public health and safety.

*Id.* § 1–615.52(a)(6). "A 'protected disclosure' under the [statute] is one that the employee 'reasonably believes' evidences one or more of the circumstances delineated in D.C. Code § 1–615.52(a)(6)(A)–(E) (2001)." The "'employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people.'" *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008) (quoting *White v. Dep't of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)). The Plaintiff alleges that her December 14 and 17, 2007 emails to members of the City Council, her December 28, 2007, and January 1, 2008, emails to Mayor Fenty, and her January 7, 2008, conversation with Mayor Fenty constituted "protected disclosures" for purposes of the Whistleblower Protection Act. Third Am. Compl. ¶¶ 45-48. The Plaintiff thus argues that the decision to place the Plaintiff on administrative leave, proposing that the Plaintiff be suspended, and ultimately terminating the Plaintiff constituted retaliatory personnel actions. *Id.* ¶ 49.

The Defendants move for summary judgment regarding the Plaintiff's Whistleblower Protection Act claim on a number of grounds, including that the Plaintiff's Whistleblower Protection Act claim fails because the Plaintiff's disclosures simply contributed to the ongoing public debate. In *Williams v. District of Columbia*, 9 A.3d 484 (D.C. 2010), the D.C. Court of Appeals confirmed what it had previously implied: a disclosure is not protected if the facts alleged are "public knowledge" and there has been "vocalized public concern about the very

16

information that [plaintiff] conveyed," although the court stopped short of limiting protected disclosures to "instances in which no one in the general public is aware of the abuse." *Id.* at 489. The Defendants allege that the Plaintiff's statements did not constitute protected disclosures because the Plaintiff was simply "giving her opinion on a policy issue that was being debated by the government and the public," and that Defendant Quintana had identified the same issues discussed by the Plaintiff during Quintana's earlier discussions with the City Council regarding the proposal during public hearings---several of which pre-date the Plaintiff's first protected disclosure by nearly nine months. Defs.' Mot. at 44-45; *see supra*, Section I.A., at 3.

The Plaintiff does not dispute this contention, except to say that "[t]his Court, in its September 30, 2009 Memorandum, held that the statements by Plaintiff were protected disclosures pursuant to the WPA." Pl.'s Opp'n at 29. The Plaintiff's argument refers to the Court's decision regarding the Defendants' motion to dismiss the Amended Complaint. *See generally Jones*, 658 F. Supp. 2d 183. The Defendants moved to dismiss the Plaintiff's Whistleblower Protection Act claim on three grounds. First, the Defendants argue the Plaintiff could not pursue a claim against Defendant Quintana in her individual capacity under the Whistleblower Protection Act. *Id.* at 198. The Court agreed with several prior decisions in this District finding the Act does not create a private right of action against individual defendants. *Id.* Second, the Defendants argued the Plaintiff's disclosures were not protected under the Act insofar as they did not evidence "gross mismanagement," "abuse of authority," or any of the other circumstances set forth in D.C. Code § 1–615.52(a)(6)(A)–(E). *Id.* at 199. The Court found that allegations in the Amended Complaint were "sufficient to suggest that she reasonably believe[d] her emails evidenced [a] substantial and specific danger to the public health and safety," and thus sufficiently alleged "protected disclosures" for purposes of a motion to dismiss.

*Id.* at 199-200. Third, the Defendants suggested the Amended Complaint failed to sufficiently allege that the Plaintiff's protected disclosure were a contributing factor in the prohibited personnel actions allegedly taken against the Plaintiff. *Id.* at 200. Noting that the Whistleblower Protection Act broadly defines "contributing factor" to mean "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision," D.C. Code § 1–615.52(a)(2), the Court found that in the context of a motion to dismiss, it reasonably could be inferred from the short timeframe between the Plaintiff's protected activity in December 2007 and the personnel action that the Plaintiff's protected disclosures were a contributing factor in the Defendants' decision to place the Plaintiff on administrative leave on January 10, 2008. *Id.* The Defendants did not argue, and thus the Court did not address, the issue presented here: whether the Plaintiff's statements merely addressed an issue already the subject of a public discussion. The Plaintiff offers no response to the Defendants' argument that the Plaintiff simply provided her opinion regarding facts previously revealed as part of the public discourse on the issue. Therefore, the Defendants are also entitled to summary judgment on the Plaintiff's Whistleblower Protection Act claim.

### B.    *First Amendment Retaliation Claim*

> It is true that individuals do not "relinquish the First Amendment rights they would otherwise enjoy as citizens" when they accept employment with the government. . . . However, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."

*Navab–Safavi v. Glassman*, 637 F.3d 311, 315 (D.C. Cir. 2011). "To balance these competing interests in First Amendment retaliation claims by government employees," the Court applies a four-factor test to determine whether an employer retaliated against an employee for the employee's exercise of her First Amendment rights:

18

First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that [his] speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

*Bowie v. Maddox*, 642 F.3d 1122, 1133 (citation omitted). The Plaintiff alleges in Count III of the Third Amended Complaint that she spoke as a citizen on a matter of public concern by "voic[ing] her concerns about [sic] safety of D.C. residents to the city council and speak[ing] with the media," and that her speech was a motivating factor in the Defendants' decisions to place the Plaintiff on administrative leave, propose a 30-day suspension, and finally terminate the Plaintiff. Third Am. Compl. ¶ 51. The Defendants move for summary judgment on the Plaintiff's First Amendment claim, arguing, among other things, that the Plaintiff failed to proffer any evidence to suggest that her protected speech was a motivating factor in any of the allegedly retaliatory acts. The Court agrees that the Plaintiff failed to proffer sufficient evidence from which a reasonable jury could conclude that the Plaintiff's protected speech was a motivating factor in prompting the Defendants' allegedly retaliatory conduct.

As a threshold matter, the Court notes that for the first time in her opposition brief, the Plaintiff alleges she also engaged in protected speech during the October 2007 labor-management meeting. Pl.'s Opp'n at 17. This allegation is nowhere to be found in the Third Amended Complaint, nor could one reasonably infer from the reference to speech before the City Council and the media that the Plaintiff's claim encompassed a meeting months prior involving neither the City Council nor the media. The Plaintiff cannot amend her complaint to significantly alter the scope of her First Amendment retaliation claim by way of her opposition to

the Defendants' dispositive motion. *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Service*, 297 F.Supp.2d 165, 170 (D.D.C. 2003) ("It is axiomatic that the Plaintiff cannot amend her Complaint by the briefs in support of or in opposition to a motion for summary judgment."). For the same reason, the Plaintiff cannot use her opposition to allege new retaliatory conduct by the Defendants. *See* Pls.' Opp'n at 21 (alleging that Defendant Quintana's knowledge of the Plaintiff's protected speech "predated the other adverse actions against Ms. Jones, from the denial of a number for her to submit a worker's compensation claim . . . , to the rejection of her request for a reasonable accommodation under the ADA to the imposition of AWOL [] status"). Therefore, in analyzing the Plaintiff's First Amendment retaliation claim, the Court considers only the protected speech identified in Plaintiff's opposition as protected speech and alleged in the Third Amended Complaint, specifically: (1) the Plaintiff's December 14 and 17, 2007, emails to members of the City Council, Pl.'s Opp'n at 15; (2) the Plaintiff's December 28, 2007, email to Mayor Fenty, *id.* at 15; and (3) the Plaintiff's January 11, 2008, interview with a local news station, *id.* at 16.

The Defendants contend that the Plaintiff fails to raise a genuine issue of fact with respect to causation in large part because Ms. Quintana was not aware of the Plaintiff's protected activity until late January 2008. The Plaintiff suggests Ms. Quintana was aware of the Plaintiff's protected activity for five reasons. The Court addresses each issue seriatim. First, the Plaintiff argues Ms. Quintana was aware of the Plaintiff's protected activity in December 2007 and January 2008 because several months prior, in October 2007, the Plaintiff told Ms. Quintana that the Plaintiff intended to contact the City Council. By her own admission the Plaintiff did not contact any member of the City Council for at least six weeks, and the Plaintiff does not allege that she ever informed Ms. Quintana that the she (the Plaintiff) actually contacted members of

the City Council.

Second, the Plaintiff alleges Ms. Quintana denied the Plaintiff and several of her co-workers leave to attend an oversight hearing before the City Council. The Plaintiff alleges that "[i]n December 2007, following [her] contacts with several City [C]ouncil members" she sought leave to attend the hearing, but "was told that Ms. Quintana personally denied [her] leave so that [she] could not testify at the Council [h]earing." Jones Aff. ¶ 19; Pl.'s Opp'n at 23 (indicating the request for leave was made "little more than three weeks" before January 10, 2008). Initially, it is unclear when this exchange might have taken place because the only City Council hearings in this timeframe discussed by the parties are (1) the December 14, 2007, hearing, which the Plaintiff attended and which preceded the Plaintiff's protected activity; and (2) the January 28, 2008, hearing at which the Plaintiff testified. Regardless, this argument is misplaced for the same reason as the Plaintiff's October 2007 statement: setting aside the fact this statement is hearsay,[5] at most it establishes that Ms. Quintana knew the Plaintiff may have wanted to speak to the City Council about the 311 merger, but does not suggest that Ms. Quintana new the Plaintiff *had already* contacted several City Councilmembers before seeking leave to attend the oversight hearing.

Third, the Plaintiff alleges, without further elaboration, that she has learned that City Councilmember Mendelson and Mayor Fenty had a policy of forwarding complaints to the agencies at issue in the complaints. The Plaintiff offers no documentation or other evidence to support her assertion that she learned (from an unknown source) that Mayor Fenty and Councilmember Mendelson had a policy of forwarding complaints to relevant District agencies,

---

[5] The Plaintiff does not even attempt to argue in her opposition that any of the hearsay statements in her declaration could be presented in a form admissible at trial. *See Wilburn v. Robinson*, 480 F.3d 1140, 1142-42 (D.C. Cir. 2007).

nor does the Plaintiff offer any evidence that either Mayor Fenty or Councilmember Mendelson forwarded any of the Plaintiff's emails to Defendant Quintana. To the contrary, Ms. Quintana testified that she did not receive any emails nor was otherwise informed by the City Council of the Plaintiff's concerns. Quintana Dep. 97:7-12; 98:6-15. Not only is the Plaintiff's assertion hearsay, without any information as where the Plaintiff learned of the alleged policies, the Court cannot determine how many levels of hearsay might be involved.

Fourth, the Plaintiff alleges that during the phone call between Mayor Fenty and Ms. Quintana following the January 7 incident, Mayor Fenty must have mentioned the Plaintiff's prior correspondence with the Mayor. This allegation is pure speculation. Plaintiff's counsel questioned Ms. Quintana regarding her conversation with the Mayor, and relevant exchange from Ms. Quintana's deposition is set forth below:

> Q: And what do you recall about -- I mean if you could recount for me as much of that conversation as you can.
>
> A: He just said what's the young lady's name I was talking to, I want you to terminate her because I think that was insubordinate, and that was that.
>
> Q: Did you ask him what he thought was insubordinate?
>
> A: No.
>
> Q: Did you see anything that you thought was insubordinate?
>
> A: Yes.
>
> Q: What was that?
>
> A: I think Ms. Jones' behavior, yelling at him and taking her headset off while she was still logged on to take 911 calls.
>
> Q: So her behavior? And how about the mayor?
>
> A: I think he was angry about it, I mean obviously, yes.

Quintana Dep. 118:17-119:15. Nothing in the record suggests Mayor Fenty ever stated to Ms.

Quintana that the Plaintiff had previously contacted him, nor is there anything to suggest Mayor Fenty and Ms. Quintana had any discussion regarding the contents of the Plaintiff's emails to the Mayor.

The Plaintiff's fifth argument is similarly speculative. The Plaintiff indicates that she contacted a local television news station on January 7, to discuss the 311 merger. Jones Aff. ¶ 35. At some point between January 7 and January 11, the Plaintiff was interviewed by a reporter at the station. *Id.* ¶¶ 36-38. The Plaintiff asserts that the reporter told her that the facts she told the reporter would need to be verified. *Id.* ¶ 43. The Plaintiff was placed on administrative leave on January 10---her first day back to work after the incident involving Mayor Fenty---and the interview aired on January 11. The Plaintiff offers no evidence, apart from her own speculation, to suggest that the reporter contacted Ms. Quintana, much less that he informed Ms. Quintana that the Plaintiff had expressed her concerns regarding the 311 merger to the reporter.

To be fair, causation is often a question for the jury. *Hall v. Ford*, 856 F.2d 255, 258 (D.C. Cir. 1988) (citations omitted). Nevertheless, to avoid summary judgment the Plaintiff must show that there is "evidence (either of a direct or indirect nature) from which a reasonable jury could find the required causal link between the protected disclosures . . . and the allegedly retaliatory actions." *Williams v. Johnson*, 701 F.Supp.2d 1, 17 (D.D.C. 2010). As the non-moving party the Plaintiff must demonstrate more than "the mere existence of a scintilla of evidence" in support of her position. *Liberty Lobby*, 477 U.S. at 252. Thus, the Court considers the (albeit speculative) evidence the Plaintiff offers to show when Ms. Quintana became aware of the Plaintiff's protected speech in combination with the other evidence the Plaintiff proffers to show her protected speech was a motivating factor in the three specified personnel actions. The

Court examines each of the personnel actions in turn.

With respect to Ms. Quintana's January 10, 2008, decision to place the Plaintiff on administrative leave, as noted above the Plaintiff offers nothing but speculation and unsubstantiated hearsay to establish Ms. Quintana was aware of the Plaintiff's protected speech as of that date. Moreover, Ms. Quintana testified that the decision to place the Plaintiff on administrative leave was made in response to Mayor Fenty's request that Ms. Quintana terminate the Plaintiff. Quintana Dep. 118:2-119:4; 125:14-126:18. The Plaintiff suggests Ms. Quintana's decision was questionable because Ms. Quintana based the decision "on her asserted conversation where she was told in one sentence that Ms. Jones was insubordinate when there is not a scintilla of evidence of any insubordinate behavior." Pl.'s Opp'n at 24. The Plaintiff fails to articulate why Ms. Quintana should have sought additional information from the Mayor when Ms. Quintana personally witnessed the incident in question. Quintana Dep. 119:2-21. No reasonable jury could conclude from this record that the decision to place the Plaintiff on paid administrative leave on January 10 was in retaliation for the Plaintiff's protected speech.

Turning to Ms. Quintana's January 18 decision to suspend the Plaintiff without pay for insubordination (referring to the January 7 incident), the Plaintiff emphasizes the short time frame between the airing of her television interview (January 11) and the issuance of the notice of proposed suspension (January 18). The Defendant argues suspension was a result of the January 7 incident involving Mayor Fenty. The record indicates that on January 10, Ms. Quintana placed the Plaintiff on administrative leave due in light of the Mayor's request that she be terminated for insubordination, but was not sure if the Plaintiff's actions "necessarily warranted termination." Quintana Dep. 125:17-126:7. In a similar context, the Supreme Court has held that "[e]mployers need not suspend previously planned [personnel actions] upon

discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 272 (2001). In *Breeden*, the employer announced that she was contemplating transferring the plaintiff, but did not transfer the plaintiff until after the employer learned the plaintiff had filed a discrimination law suit. *Id.* The Court ruled that the fact the employer became aware of the plaintiff's lawsuit one month before the transfer "is immaterial in light of the fact that [the employer] concededly was contemplating the transfer before it learned of the suit." *Id.* Here, the undisputed evidence indicates Ms. Quintana was contemplating disciplining the Plaintiff by way of termination as of January 10. Under *Breeden*, the fact that Ms. Quintana watched the Plaintiff's interview with a local news station before issuing the notice of proposed suspension is immaterial because Ms. Quintana was contemplating a more severe sanction before learning of the Plaintiff's protected activity.[6]

Curiously absent from the Plaintiff's discussion of her First Amended retaliation claim is *any* discussion of the Plaintiff's termination, which was first proposed by the Defendants on August 14, 2008---over seven months after the Plaintiff's last protected speech regarding the 311 merger. The Plaintiff concedes that under *Breeden*, a six month gap cannot support an inference of causation. Pl.'s Opp'n at 23; *Breeden*, 532 U.S. at 273 (citing with approval cases finding three and fourth month gaps insufficient to support an inference of causation); *see also Payne v. District of Columbia*, 741 F. Supp. 2d 196, 219-20 (D.D.C. 2010) (finding eight month gap insufficient to support inference of causation regarding plaintiff's First Amendment retaliation claim). Moreover, the Plaintiff fails to respond to the Defendants' contention that it would have

---

[6] *See also Anderson v. Ramsey*, No. 04-56, 2006 WL 1030155, at *12 (D.D.C. Apr. 19, 2006) (finding the same holding in *Breeden* instructive in the context of a First Amendment retaliation claim).

terminated the Plaintiff even absent any protected speech because of the Plaintiff's repeated AWOL status, thus conceding the argument. *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F.Supp.2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). Accordingly, the Defendants are entitled to summary judgment on all aspects of the Plaintiff's First Amendment Retaliation claim.

### C. Americans with Disabilities Act Retaliation Claim

The Americans with Disabilities Act provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The Plaintiff alleges in Count V of the Third Amended Complaint the Defendants terminated the Plaintiff in retaliation for her July 2008 meeting with an EEO counselor regarding the Defendant's alleged failure to accommodate the Plaintiff's disability. Third Am. Compl. ¶¶ 55-58. As with the prior claims, the Defendants seek summary judgment with respect to the Plaintiff's ADA retaliation claim on a number of grounds, only one of which the Court need address, namely, the Plaintiff's failure to exhaust her administrative remedies.

"Before bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving that agency a chance to act on it." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (citing 42 U.S.C. § 12117(a)). "[O]rdinarily receipt of a notice of right-to-sue letter is a condition precedent" to filing suit under the ADA. *Dahlman v. Am. Ass'n of Retired Persons*, 791 F. Supp.

2d 68, 75 (D.D.C 2011).  The Defendants argue the Plaintiff failed to exhaust her administrative remedies with respect to her ADA retaliation claim because the Plaintiff filed suit before the District of Columbia Office of Human Rights issued the Plaintiff a right-to-sue letter regarding the claims.

The Plaintiff contacted an EEO counselor in July 2008 in connection with the Defendants' alleged failure to accommodate the Plaintiff's disability.  The July 24, 2008, letter from OUC to the Plaintiff advised the Plaintiff that she may be terminated if she did not work her full ten-hour shifts.  The Plaintiff filed a charge of discrimination with the Office of Human Rights on August 7, 2008, alleging the Defendants subjected the Plaintiff to a hostile work environment and discriminated against her on account of her disability, and further claimed that the July 24 letter was issued in retaliation for the Plaintiff consulting an EEO counselor, in violation of the District of Columbia Human Rights Act.  The Plaintiff was ultimately terminated on September 26, 2008.  In October 2008, the Plaintiff amended her charge of discrimination to include retaliatory discharge in violation of the Americans with Disabilities Act.  The Plaintiff amended her initial complaint on January 2, 2009, to include the present retaliation claim *under the ADA*, at which point the Office of Human Rights had yet to make any determination as to the Plaintiff's charge of discrimination.  Accordingly, on June 24, 2009, the Office of Human Rights dismissed the Plaintiff's charge because it was "informed that a similar charge" was filed with this Court.

The Plaintiff does not dispute the fact that she has never received a right-to-sue letter regarding her ADA retaliation claim.  Instead, the Plaintiff suggests that she never sought to bring a retaliation claim pursuant to the ADA, but rather intended to bring a claim for retaliation in violation of the District of Columbia Human Rights Act.  Pl.'s Opp'n at 25.  The Plaintiff

explains:

> When Plaintiff was terminated, she moved to amend her complaint to add the termination and the failure to reasonably accommodate her. The termination claim was categorized as retaliation for having filed a disability claim. The filing was confused and the terminology of an ADA claim became part of the reference. The Court, in its September 30, 2009, decision, relying on the amended complaint, sought to clarify the situation stating the retaliation claim was pursuant to the Americans With Disabilities Act, because she alleged that she was terminated one month after filing a claim that the OUC had violated the ADA. The Amended Complaint was in error. As seen now from Defs' Exh 24, Ms. Jones filed a complaint about disability, but did not mention the ADA. [S]ince it was filed with OHR and since it was based on the EEO Counselor's Notice of Right to File, which granted her permission to file a DCHRA claim, Defs' Exh 22, more accurately, the retaliation is from a DCHRA filing.

Pl.'s Opp'n at 25. Whatever confusion might have existed in 2009, nothing in the Plaintiff's opposition excuses the fact she explicitly invoked the American with Disabilities Act in her Third Amended Complaint---the operative complaint for purposes of the Defendants' motion. Count V of the Third Amended Complaint, in which the Plaintiff alleges she was fired in retaliation for filing a discrimination complaint in August 2008, does not specify under which statute the Plaintiff seeks relief. Third Am. Compl. ¶¶ 55-58. However, in her prayer for relief, the Plaintiff seeks "[a]n order declaring defendants' actions *to be retaliation against Ms. Jones in violation of the Americans with Disabilities Act of 1990*, as amended," and "[a]n order enjoining defendants from continuing to discriminate and/or retaliate against Ms. Jones regarding her reasonable accommodations" under the ADA. *Id.* at 10 (emphasis added). The only reference to the District of Columbia Human Rights Act in the entirety of the Third Amended Complaint appears in the tenth paragraph of the prayer for relief, which seeks "[a]n order granting plaintiff attorney's fees pursuant to the D.C. Whistleblower statue; 42 U.S.C. 2000 et[] [s]eq,[ ]the District of Columbia's Human Rights Act, the federal Access to Justice Act and 42 U.S.C. §1983." *Id.* The Plaintiff cannot amend her claim to state a cause of action under a different

statute by way of her opposition brief.  *Arbitraje Casa de Cambio, S.A. de C.V.*, 297 F. Supp. 2d at 170.  Therefore, the Defendants are entitled to summary judgment on the Plaintiff's ADA retaliation claim.

## IV.  CONCLUSION

For the foregoing reasons, viewing the evidence in the light most favorable to the Plaintiff, the Court finds the Plaintiff failed to raise an genuine issue of material fact with respect to any of the claims in Third Amended Complaint.  The Plaintiff did not respond to the Defendants' contention that the Plaintiff's conduct did not amount to a protected disclosure under the District of Columbia Whistleblower Protection Act because the Plaintiff's comments conveyed information already at issue in the public debate concerning the 311 merger.  The Plaintiff failed to produce sufficient evidence from which a reasonable jury could conclude that the Plaintiff's protected speech was a motivating factor in the decision to place the Plaintiff on administrative leave, proposed suspension of the Plaintiff, or the Defendants' ultimate termination of the Plaintiff.  Finally, the Plaintiff concedes that she filed her claim for retaliation in violation of the Americans with Disabilities Act without first receiving a right to sue notice, and thus failed to exhaust her administrative remedies.  Accordingly, the Defendants' [91] Motion for Summary Judgment is GRANTED.  An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE